IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 18, 2007

**QUINTELL HARDY v. STATE OF TENNESSEE**

**Direct Appeal from the Circuit Court for Rutherford County**
**No. F-59197     Don R. Ash, Judge**

_____

**No. M2007-00543-CCA-R3-CD - Filed March 4, 2008**

_____

The petitioner, Quintell Hardy, appeals the denial of his petition for post-conviction relief from his conviction for second degree murder, arguing that he was denied the effective assistance of counsel and that his guilty plea was unknowing and involuntary. Following our review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and D. KELLY THOMAS, JR., JJ., joined.

Charles G. Ward, Murfreesboro, Tennessee, for the appellant, Quintell Hardy.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; and William C. Whitesell, Jr., District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The prosecutor set out the facts surrounding the petitioner's conviction at the guilty plea hearing:

> I think the facts would show that sometime around 2:14 a.m. on the morning of May 25th, 2005, a 9-1-1 call was received. The initial call was that an intruder had broken into a home and stabbed Mr. Keith Williams who is the victim and also the stepfather of [the petitioner]. The police arrived on the scene. In addition to [the petitioner,] there were I believe two sisters present at the house or some other occupants. They all came to the police department where they were questioned. It was apparent that [the victim] had been stabbed with a sword that led to his death.

Initially [the petitioner] told the police that in fact an intruder had broke[n] into the house and stabbed his stepfather. Later after he was questioned further he made a statement to the police that he and his stepfather had in fact argued and during the course of the argument the stepfather had grabbed for the sword. It had slipped and in effect he had been accidentally stabbed. Based on the autopsy report and certain physical evidence found at the house it was apparent to the police that the story that was given . . . by [the petitioner] and the physical evidence did not match up. And therefore he was ultimately charged with murder in the first degree.

On June 5, 2006, the petitioner, who was seventeen years old at the time of the offense, was transferred from juvenile court to circuit court to be tried as an adult. That same day, he entered a best interest guilty plea to second degree murder, a Class A felony, and was sentenced to thirty years at 100% in the Department of Correction.

On August 28, 2006, the petitioner filed a *pro se* petition for post-conviction relief, alleging that his guilty plea was involuntary; his conviction was based on a coerced confession, a violation of the privilege against self-incrimination, and the failure of the prosecution to disclose evidence favorable to him; and his counsel was ineffective. On October 23, 2006, following the appointment of counsel, the petitioner filed an amended petition alleging that he was incompetent when he entered his guilty plea.

At the January 26, 2007, evidentiary hearing, the petitioner testified that, at the time of the offense, he was in the tenth grade and had been in special education classes since the third grade. He denied that he and trial counsel discussed Dr. Pamela Auble's report wherein she stated his reading capacity was at third grade level and that his verbal knowledge and reasoning were in the retarded range. The petitioner acknowledged that trial counsel reviewed the plea agreement with him and that he signed it. The petitioner said he "flipped through" the petition but did not "understand the words. I can't read it. I probably could get some little words, little words I barely know. But half the sheet I can't understand it." Asked if he had voluntarily pled guilty, the petitioner testified:

No. I ain't trying to – I didn't volunteer to plead guilty on this charge thing. I just . . . I didn't know a plea bargain or whatever that thing is supposed to say guilty to it. Which I ain't trying to plead guilty to nothing because I told him I wasn't pleading guilty to no charges like that to no first or whatever that thing is.

On cross-examination, the petitioner said that he decided to file a petition for post-conviction relief after talking to "an inmate lawyer" because he had been "misled" in his case. He said that he wanted the court to set aside his guilty plea and allow him to have a trial. Asked why he did not inform the trial court that he wanted to reject the plea offer and proceed to trial, the petitioner replied, "I don't even know. I was just going by what my lawyer told me to say. That's all I was just doing."

Trial counsel testified that he had been licensed to practice law since 1998 and that approximately 90% of the criminal cases he handled involved juvenile court. He said that he was

-2-

appointed to represent the petitioner at the first detention hearing and that the State "[a]lmost immediately" filed a petition to transfer the case to adult court. He explained the actions he took in preparing for the petitioner's case:

> I interviewed the [petitioner]. Spoke with many police officers involved in it. We had a bond reduction hearing. We had a subsequent second detention hearing where I tried to get him out. . . . I talked to school officials. I spoke with [the prosecutor] more times than I could count. With [the petitioner] numerous numerous times. I hired Dr. Pamela Auble. I hired Dr. William Kenner to do evaluations. It was Dr. Kenner first. He recommended I get another doctor. And that was done. [The petitioner] went through a couple of different kinds of evaluations plus one by the [S]tate of Tennessee at Chattanooga when he went which was the initial evaluation.

Trial counsel said that, after reviewing the lead detective's case file, he knew the State's theory would be premeditated murder. He said he concentrated on a "battered person" defense which he discussed with Drs. Kenner and Auble. Counsel said that, until three days before the transfer hearing, the petitioner maintained that he and the victim had struggled over the sword. While reviewing the petitioner's videotaped statement with him at the detention center, counsel noticed "a horrible look come over [the petitioner's] face" after the petitioner had given a third or fourth version of the incident to the detective. Counsel asked the petitioner if he wanted to tell him something, and the petitioner's "face fell." The petitioner then told counsel: "I was sure [the victim] was going to kill me and I walked in there and killed him. And he sat up in bed and looked at me and said you don't have the guts."

Trial counsel said that co-counsel, who had been the public defender in Rutherford and Cannon Counties since 1989, was appointed to assist him. Counsel said that the State's initial offer was forty years for second degree murder and that the State ultimately accepted counsel's counteroffer of thirty years. Counsel said that he was "absolutely" prepared to go to trial and that he had spent between fifty and seventy hours preparing the case. Counsel said he reviewed "every line of the entire" plea agreement with the petitioner because, based on the doctors' reports, he knew the petitioner would have "a problem with it." He said that Dr. Kenner also met with the petitioner to make sure he understood the agreement. Asked if he believed the petitioner understood what he was doing when he entered the plea, counsel stated:

> I believe he knew exactly what he was doing. . . . The reason I know is because we went over this new information that he had given us. And I explained to him over and over about the element of premeditation. If we were going to go forward with the battered person syndrome I told [the petitioner] there's no – we can't get up there and say anything but yes, sir, we meant to kill him and we did it and we went in there and did it. We have to get that out of the way. Because, number one, you can't lie. I can't let you lie up there. And that's going to be part of our defense. So, . . . there's no question at this point about premeditation. And that's what I told him. And you are risking the rest of your life at 18 years old on either life with parole or life without

parole if it's not a straight acquittal. And that's iffy on something like that. [Co-counsel] was there, too, during all this. And it was decided that [the petitioner] at 30 years he could get out of jail in his early 40s and at least have some life left to live and not take that risk. And that was the whole idea behind the deal.

On cross-examination, trial counsel said that he reviewed Dr. Auble's report, including her determination that the petitioner's verbal knowledge and reasoning were in the retarded range, with the petitioner and discussed it with the prosecutor. He said that the transfer agreement was signed and dated the same day as the petitioner's plea agreement so that the petitioner could remain in the juvenile detention center rather than the adult detention center.

On February 2, 2007, the post-conviction court entered a written order dismissing the petition. The court concluded that the transcript of the guilty plea hearing reflected that the petitioner had voluntarily and knowingly entered his guilty plea and that the petitioner had failed to prove his claim of ineffective assistance of counsel.

## ANALYSIS

The petitioner argues that the post-conviction court erred in finding that he received the effective assistance of trial counsel and that he entered his guilty plea knowingly, intelligently, and voluntarily.

### I. Post-Conviction Standard of Review

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f) (2006). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

### II. Ineffective Assistance of Counsel

On appeal, the petitioner claims that trial counsel failed to sufficiently explain the plea agreement to him, saying that counsel should have "[gone] over each and every line numerous times and spent more time th[a]n just one day explaining every one of the documents."

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687, 104 S. Ct. at 2064.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688, 104 S. Ct. at 2065; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. In the context of a guilty plea, the petitioner must show a reasonable probability that were it not for the deficiencies in counsel's representation, he would not have pled guilty but would instead have insisted on proceeding to trial. Hill v. Lockart, 474 U.S. 52, 59, 106 S. Ct. 366, 370 (1985); House v. State, 44 S.W.3d 508, 516 (Tenn. 2001).

In its findings of fact and conclusions of law, the post-conviction court, after recounting in detail the testimony of the petitioner and his trial counsel, concluded that counsel had "performed with extraordinary training and skill and protected the [p]etitioner's interests with every decision and strategy pursued in his defense." Accordingly, the court credited the testimony of trial counsel and concluded that the petitioner had failed to show either that counsel was ineffective or that he had been prejudiced by counsel's actions. As for the petitioner's claim that counsel should have spent more time explaining the various documents attendant to the plea of guilty, the post-conviction court did not conclude either that counsel was ineffective in not explaining these documents additional times or that the petitioner was prejudiced because this did not occur. The record supports this determination.

### III. Involuntary Guilty Plea

In an interrelated claim, the petitioner also contends that his guilty plea was not knowingly, voluntarily, or intelligently entered because of his "retarded range and his reading level." The State

argues that the evidence supports the post-conviction court's finding that the petitioner freely, voluntarily, and knowingly entered his plea. We agree with the State.

When analyzing a guilty plea, we look to the federal standard announced in Boykin v. Alabama, 395 U.S. 238, 89 S. Ct. 1709 (1969), and the state standard set out in State v. Mackey, 553 S.W.2d 337 (Tenn. 1977). State v. Pettus, 986 S.W.2d 540, 542 (Tenn. 1999). In Boykin, the United States Supreme Court held that there must be an affirmative showing in the trial court that a guilty plea was voluntarily and knowingly given before it can be accepted. 395 U.S. at 242, 89 S. Ct. at 1711. Similarly, the Tennessee Supreme Court in Mackey required an affirmative showing of a voluntary and knowledgeable guilty plea, namely, that the defendant has been made aware of the significant consequences of such a plea. Pettus, 986 S.W.2d at 542.

A plea is not "voluntary" if it results from ignorance, misunderstanding, coercion, inducements, or threats. Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993). The trial court must determine if the guilty plea is "knowing" by questioning the defendant to make sure he or she fully understands the plea and its consequences. Pettus, 986 S.W.2d at 542; Blankenship, 858 S.W.2d at 904. Because the plea must represent a voluntary and intelligent choice among the alternatives available to the defendant, the trial court may look at a number of circumstantial factors in making this determination. Blankenship, 858 S.W.2d at 904. These factors include: (1) the defendant's relative intelligence; (2) his familiarity with criminal proceedings; (3) whether he was represented by competent counsel and had the opportunity to confer with counsel about alternatives; (4) the advice of counsel and the court about the charges against him and the penalty to be imposed; and (5) the defendant's reasons for pleading guilty, including the desire to avoid a greater penalty in a jury trial. Id. at 904-05.

The transcript of the guilty plea hearing reflects the following colloquy:

THE COURT: [H]as anyone forced you or coerced you to enter this agreement today?

THE [PETITIONER]: No, sir.

. . . .

THE COURT: And you're pleading guilty to a lesser charge of second degree murder; is that correct?

THE [PETITIONER]: Well, I ain't pleading guilty. I'm just taking it because that's what's best for me.

THE COURT: Okay. You're going to do a best interest plea. Do you understand that?

THE [PETITIONER]: Yes, sir.

. . . .

THE COURT: I have here in front of me a negotiated plea agreement. Did you review that with your attorney?

THE [PETITIONER]: Yes, sir.

THE COURT: Do you have any questions about that document?

THE [PETITIONER]: No, sir.

THE COURT: Do you feel like you understand that completely?

THE [PETITIONER]: Yes, sir.

. . . .

THE COURT: And you understand that that's going to be a 30 year sentence at 100 percent. Do you understand that?

THE [PETITIONER]: Yes, sir.

THE COURT: Any questions about what you're doing today?

THE [PETITIONER]: No, sir.

The post-conviction court concluded that the petitioner's plea of guilty was knowing and voluntary, and the record supports this determination. Accordingly, we conclude that this claim is without merit.

## CONCLUSION

Based on our review, we conclude that the petitioner has failed to show that he is entitled to post-conviction relief. Accordingly, we affirm the denial of the petition.

_____
ALAN E. GLENN, JUDGE

-7-